UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA L. BRILL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INVIVYD, INC., TILLMAN U. GERNGROSS, and LAURA WALKER,<br><br>Defendants. | No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Laura L. Brill ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to plaintiff's own acts and on information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys.  The investigation included, among other things, consultation with experts and review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Invivyd, Inc. f/k/a Adagio Therapeutics, Inc. ("Adagio" or the "Company"), Adagio's press releases, public information about Adagio, including information posted on the Company's website and otherwise available on the internet, and analyst and media reports on Adagio. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all purchasers of Adagio common stock between November 29, 2021 and December 14, 2021, both dates inclusive (the "Class Period"), seeking remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

3.      The claims asserted herein arise under and are pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The Company maintains its principal executive offices in this District and the dissemination of materially false and misleading statements occurred in this District.

- 1 -

5.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Laura L. Brill purchased Adagio common stock during the Class Period, as set forth in the certification attached hereto and incorporated by reference herein, and suffered damages as a result.

7.    Defendant Adagio Therapeutics, Inc. is a Delaware corporation with executive offices located in Waltham, Massachusetts.  During the Class Period, the Company was focused on developing ADG20, an investigational monoclonal antibody treatment for COVID-19.  In September 2022, Adagio announced that it was changing its corporate name to Invivyd, Inc.

8.    Defendant Tillman U. Gerngross ("Gerngross") co-founded Adagio and was its Chief Executive Officer ("CEO") and a member of the Company's Board of Directors (the "Board") during the Class Period.  On February 18, 2022, Adagio announced defendant Gerngross's resignation.

9.    Defendant Laura Walker ("Walker") co-founded Adagio and was, at all relevant times, its Chief Scientific Officer ("CSO").

10.    Defendants Gerngross and Walker are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with Adagio, are referred to herein as "defendants."

11.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, and future

business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the Nasdaq Global Market, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, and present and future business prospects.  In addition, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Adagio's operations, business, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the public filings alleged herein to be misleading before or shortly after their issuance, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is

responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## FACTUAL BACKGROUND

**SARS-CoV-2, the COVID-19 Pandemic,
and Coronavirus Variants**

14.     On December 31, 2019, the World Health Organization ("WHO") was formally notified about a cluster of cases of pneumonia in Wuhan City, China.  The cause of this "pneumonia" was a novel virus, initially known as severe acute respiratory syndrome coronavirus 2 ("SARS-CoV-2"), or, more generically, coronavirus.  The disease caused by SARS-CoV-2 would later be named COVID-19.

15.     On March 11, 2020, the WHO declared the COVID-19 outbreak a worldwide pandemic.  Since then, COVID-19 has spread to countries around the globe and resulted in millions of deaths worldwide.

16.     Viruses such as SARS-CoV-2 constantly change through genetic mutation.  These mutations sometimes result in a new variant of the original virus.  This ability for viruses to mutate and evade the human immune system and continue to cause infection is called "viral escape."  As of the date of the filing of this complaint, various health organizations around the world, including the WHO, are monitoring numerous variants of SARS-CoV-2, including Alpha, Beta, Gamma, Delta, and Omicron.

17.     Health organizations around the world, including the WHO and the U.S. Centers for Disease Control and Prevention ("CDC"), classify variants into different categories.  The most common classifications are the "variants of interest" and the "variants of concern."  The WHO defines a variant of interest ("VOI") as a variant:

- with genetic changes that are predicted or known to affect virus characteristics such as transmissibility, disease severity, immune escape, diagnostic or therapeutic escape; AND

- that has been identified as causing significant community transmission or multiple COVID-19 clusters, in multiple countries with increasing relative prevalence alongside increasing number of cases over time, or other apparent epidemiological impacts to suggest an emerging risk to global public health.

The WHO also defines a variant of concern ("VOC") as a variant that meets the definition of a VOI and, through a comparative assessment, is associated with one or more of the following changes at a degree of global health significance:

- increase in transmissibility or detrimental change in COVID-19 epidemiology; OR

- increase in virulence or change in clinical disease presentation; OR

- decrease in effectiveness of public health and social measures or available diagnostics, vaccines, [and] therapeutics.

18.     Variants may be classified differently depending on the country and the prevalence of any particular variant strain.  While other variants have been classified as a VOC in the past, both the WHO and the U.S. SARS-CoV-2 Interagency Group currently classify the Omicron variant as a VOC.

19.     The structural portion of the SARS-CoV-2 virus that is responsible for the virus's entry into the host cell is called the "spike protein."  The spike protein binds to the surface of the host cell, allowing the virus to enter the host and begin replicating.  Spike proteins are referred to as such because they look like spikes projecting out from the surface of the virus.  When observed under an electron microscope, the spikes appear as projections emanating around the center of the virus, resembling the solar corona.  This is why this family of viruses is known as "coronaviruses."

20.     To combat the COVID-19 pandemic, scientists, health agencies, and governments across the world have worked together to develop a number of therapies for the treatment and prevention of COVID-19.  For example, there are currently three COVID-19 vaccines authorized or approved for use in the United States and many pharmaceutical companies are developing antiviral pills and monoclonal antibody therapies to treat and/or prevent COVID-19 and its variants.  Most of the currently available vaccines and antibody treatments for COVID-19 target the spike protein.  If the body's immune response successfully targets the spike protein, the virus is less likely to bind to host cells and cause an infection.  The ability of antibodies to block the sites on the spike protein that the virus uses to enter the host cell, thereby preventing infection, is known as "neutralization."

21.     Most of the mutations present in the circulating variants are located on the spike protein.  Spike protein mutations are concerning because if the spike proteins mutate too much, the antibodies that combat them will not be effective at preventing the virus from binding to the host cell.  As the virus and its variants have continued to mutate, these mutations have avoided the body's various immune responses (*i.e.*, "escaped"), contributing to enhanced infection and transmission and reduced efficacy of vaccines and antibody therapies.

**Adagio Is Formed to Develop a
COVID-19 Treatment**

22.     Adagio is a clinical-stage biopharmaceutical company that during the Class Period was focused on developing a monoclonal antibody ("mAb") therapy for the prevention and treatment of COVID-19.  The Company formed in June 2020, during some of the worst days of the pandemic, to develop drugs for the treatment and prevention of COVID-19 and future coronavirus outbreaks.

23.    On August 6, 2021, Adagio conducted an initial public offering ("IPO").  As part of Adagio's IPO, Adagio filed with the SEC a Form S-1 Registration Statement on July 16, 2021, which became effective on August 5, 2021.  On the day of the IPO, August 6, 2021, Adagio filed its final prospectus with the SEC on Form 424B4 ("Prospectus").

24.    Adagio's lead product candidate during the Class Period is known as ADG20. According to Adagio, "ADG20 is designed to be a potent, long-acting and broadly neutralizing antibody for both the treatment and prevention of COVID-19 as either a single or combination agent."  Adagio stated in its Prospectus that, "[i]n *in vitro* studies, ADG20 has demonstrated neutralizing activity against SARS-CoV-2 and the emerging variants that have been associated with lower efficacy rates of certain vaccines and are resistant or partially resistant to a subset of currently available or clinical-stage mAbs."[1]

25.    Further, Adagio represented that "[u]nlike other antibody-based therapies specifically targeting SARS-CoV-2, ***ADG20 has demonstrated an ability in non-clinical studies an ability to neutralize SARS-CoV-2, including variants of concern***, as well as a broad range of SARS-like viruses with neutralization potency at $IC_{50}$ (half maximal inhibitory concentrations) of approximately 0.01 mcg/mL or less in live-virus cellular assays."  In other words, Adagio claimed that a very small amount of ADG20 (0.01 micrograms per milliliter) can inhibit virus growth, *in vitro*, by 50%.

26.    Adagio also stated in the Prospectus that "ADG20 maintained neutralization activity across all variants tested to date."  According to Adagio, at the time of the IPO, ADG20 had demonstrated "neutralizing activity *in vitro* against common circulating SARS-CoV-2 variants," including the Alpha, Beta, Gamma, and Delta variants.

---

[1]    *In vitro* studies are conducted in a laboratory setting, most often in a test tube or petri dish.  *In vitro* studies are not performed on humans or animals.

**Defendants Repeatedly Boast that ADG20
Is Successful Against Known Variants**

27.     Following the IPO, defendants Gerngross and Walker, as well as other Adagio executives, presented data on and discussed ADG20's potency against COVID-19 and then-existing variants at several investor conferences.  For example, on September 15, 2021, at the Morgan Stanley 19th Annual Global Healthcare Conference, defendant Walker stated that ADG20 was "maintaining its potency" against "many other variants, including Lambda variant, the new variant, Beta, Gamma, et cetera, the major ones that have been described."  Defendant Walker similarly asserted that "we don't have any concerns to date in terms of lack of activity against variants."

28.     On October 6, 2021, at the Guggenheim 2nd Annual Vaccine & Infectious Disease Day, defendant Walker reiterated Adagio's confidence in ADG20's effectiveness against existing variants, stating that "we are continually testing [ADG20] against new variants of concern and variants of interest.  And so far [ADG20] has maintained activity within five-fold of the original . . . virus [and] against all of the current variants of concern."  Defendant Walker likewise affirmed that "we don't have concerns" when it came to ADG20's effectiveness against then-circulating variants.

29.     Similarly, on November 16, 2021, at the Stifel 2021 Healthcare Conference, defendant Walker touted the effectiveness of ADG20 against variants, stating that "so far we've seen that ADG20 retains its activity across a very large panel of these different variants at least within five-fold of the original . . . virus."

**The Omicron Variant Emerges**

30.     On November 4, 2021, scientists in South Africa began to see samples of COVID-19 that looked different from previous samples, alerting them to a possible change in the

virus's genetic makeup.  Over the next several weeks, doctors and scientists in South Africa continued to collect and study various COVID-19 samples from patients.

31.     On November 24, 2021, doctors and scientists in South Africa first reported the new COVID-19 strain to the WHO.  The next day, the Health Department of South Africa called a virtual press conference alerting the public of this possible new variant, although it had not been given any such designation by the WHO at that time.

32.     By November 25, 2021, there were over 80 cases of this possible new variant, with the majority concentrated in South Africa.

33.     On November 26, 2021, the WHO's Technical Advisory Group on SARS-CoV-2 Virus Evolution ("TAG-VE") held an emergency meeting to discuss this new variant.  Based on its assessment, the TAG-VE designated the variant a VOC and named it Omicron, keeping in line with the Greek alphabet nomenclature the WHO had been using to name variants.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

34.     The Class Period begins on November 29, 2021.  On that date, just three days after the WHO designated Omicron a VOC, Adagio issued a press release which announced that ADG20 would be effective against the Omicron variant (the "November 29 Press Release").  The November 29 Press Release quoted defendant Walker as stating, in pertinent part, as follows:

> "*Due to the highly conserved and immunorecessive nature of the epitope recognized by ADG20, we expect that ADG20 will retain activity against Omicron, as we have observed in in vitro models with all other variants of concern identified previously.  Further, none of the mutations present in . . . the Omicron variant have been associated with escape from ADG20 neutralization.*"

35.     The November 29 Press Release further stated that, "as shown in *in vitro* studies, ADG20 retains activity against prior variants of concern including Alpha, Beta, Delta, and

Gamma."   In addition, defendants represented that ADG20 was effective against Omicron, stating, "[f]or the Omicron variant, none of the mutations present in the spike protein are associated with escape from ADG20 neutralization."   The November 29 Press Release further stated that "[b]ased on published epitope mapping and structural studies, Adagio anticipates that ADG20 will retain neutralizing activity against the Omicron variant whereas other mAb products may lose substantial activity against this variant."

36.     That same day, November 29, 2021, defendant Gerngross appeared on the CNBC program "The Exchange" to discuss ADG20 and the November 29 Press Release.   During the interview, defendant Gerngross stated, in pertinent part, as follows:

> We very early on appreciated the potential danger from variants emerging, and you see this with many infectious diseases in particular, in fact, coronaviruses*. So we from the beginning sort of thought about that possibility and decided to design a molecule that is broadly neutralizing across the entire class of these SARS-like viruses* . . . .

37.     When asked how Adagio formulated ADG20 to treat COVID-19, defendant Gerngross responded, in pertinent part, as follows:

> What we sought to find is a molecule that neutralizes SARS-1 as well as SARS-CoV-2 and targets a very unique site that the virus has not been able to change a lot without losing fitness.   *And so we target this highly conserved epitope and [ADG20] has shown to be resilient, to date, against any of the variants that have emerged*.

38.     Defendant Gerngross continued: "***What we know is that our antibody, based on a sequence analysis, is likely to bind to Omnicron [sic] and not lose any of its neutralization potency***."

39.     Defendant Gerngross then claimed that ADG20 had the potential to be more effective than available COVID vaccines.   He noted "the remarkable half-life of the antibody" and highlighted its "***ability of being injected once and after six months the neutralization titers of [ADG20] are significantly higher than we see with any of the vaccines***."

40.     Also on November 29, 2021, defendant Gerngross represented to the *Boston Business Journal* in an interview that was widely and publicly disseminated that ADG20 "'neutralized SARS 1'" and "'***will neutralize SARS-CoV-2 and all its known variants***.'"  At the time, this included Omicron as a "known variant."

41.     On December 1, 2021, defendants Gerngross and Walker and other Adagio executives virtually attended the Evercore ISI 4th Annual HealthCONx Conference where they discussed ADG20's development, as well as the status of the COVID-19 pandemic, other available COVID-19 treatments, and the Omicron variant.  In his opening remarks, defendant Gerngross stated, in pertinent part, as follows:

> *[M]ajor aspect of the [ADG20] program was to create a molecule that deals with all the variants by designing something that is broadly neutralizing, hitting a unique capital that has been highly conserved and therefore is less likely to result in [viral escape] and that's what we've seen up to this point*.

42.     Addressing Omicron specifically, Gerngross stated that "[t]he data on Omnicron [sic] as far as localization is yet to come, but ***everything that we've seen so far up to this point where we look for all in terms of having been able to neutralize all the other variants***."

43.     The statements referenced above in ¶¶34-42 were materially false and misleading when made because they failed to disclose the following material adverse facts, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that the published epitope mapping, structural studies, and sequence analyses which defendants had used to claim ADG20 was effective against Omicron were insufficient, unreliable, and inadequate to make claims of effectiveness of ADG20 against Omicron;

(b)     that defendants' claims regarding ADG20's efficacy against Omicron lacked a reasonable factual basis; and

(c)    that ADG20 was over 300 times less effective against the Omicron variant as compared to its effectiveness against previous variants.

44.    Leading up to and throughout the Class Period, defendants repeatedly touted the effectiveness of ADG20 against the original virus strain and all of the then-current variants, and painted the false and misleading picture to the investing public that ADG20 would be just as effective against Omicron as it was against the other variants.   These statements had their intended effect, as the price of Adagio common stock skyrocketed from $25.12 per share on November 26, 2021 to $46.83 per share on November 29, 2021, an increase of **over 86%** on unusually high trading volume.

45.    Then, on December 14, 2021, Adagio issued a press release reporting *in vitro* results of ADG20 against the Omicron variant (the "December 14 Press Release").   In the December 14 Press Release, only a few weeks after assuring investors of the efficacy against Omicron, Adagio announced that "[t]he *in vitro* data generated through both authentic and pseudovirus testing of the Omicron variant show a greater than 300-fold reduction in neutralizing activity of ADG20 against Omicron."   In other words, Adagio revealed that the data showed that ADG20 was ***300 times less effective*** at neutralizing Omicron than it was against the other variants.   Put simply, the Company admitted that the results showed that ADG20 did not work against Omicron.   Defendant Gerngross explained: "'While the individual mutations present in . . . Omicron . . . were not associated with escape from ADG20 in the context of an original strain of the virus, new data show that the combination of mutations present in the Omicron spike protein led to a reduction in ADG20 neutralization that was not suggested by prior data.'"

46.    As a result of this news, the price of Adagio common stock plummeted from $34.26 per share when the market closed on December 13, 2021, to $7.26 per share when the

market closed on December 14, 2021, a nearly **80% decline** on unusually heavy volume of over 41 million shares traded.  As the market continued to digest the news, the price of Adagio common stock continued to decline, falling to a low of just $5.57 per share by December 15, 2021.

47.     Analysts were surprised by the disclosure and reacted negatively.  For example:

(a)     On December 14, 2021, analysts from Morgan Stanley released a report titled "Limited Omicron Neutralization Surprising; Downgrade To [Equal-Weight]," slashing their price target from $49 to $11 and noting that the results about ADG20 in the December 14 Press Release were "surprising and will likely limit the utility of ADG20."  The analysts made clear that "[w]hile ADG20 does have broad activity against other variants, given our expectation the Omicron will become dominant quickly, we believe the uncertainty will limit the drugs [sic] utility" and "the increased uncertainty negatively skews the risk/reward."

(b)     On December 14, 2021, analysts from Jefferies LLC noted in a published report that the results regarding ADG20 described in the December 14 Press Release placed into question ADG20's overall efficacy because "if Omicron is a major proportion of cases in studies and was not predicted based on strong data in all other variants including Delta and based on mapping."  The analysts further noted that the December 14 Press Release results were "a negative surprise" and acknowledged that "today's in-vitro results . . . will call into the question the chance of success for Phase III data in 2022 and what role ADG20 can play" in the treatment and prevention of COVID-19.

(c)     On December 14, 2021, analysts from Guggenheim Securities, LLC released a report titled "ADG20 Omicron Neutralization Data Disappointing," noting in part that the "[r]esults are surprising given the prior reports that the individuals [sic] mutations were not

associated with escape [in] both internal and external neutralization studies against [variants of concern]."

(d)     On December 15, 2021, analysts from Guggenheim Securities, LLC downgraded Adagio from "buy" to "neutral" following the "thesis-changing news that the Omicron variant escapes ADG20" and removed its price target, noting that "we remain on the sideline given the limited near-term visibility into the Omicron-driven uncertainty around ADG20's strategic and commercial optionality."

48.     Members of the news media also widely reported on the December 14 Press Release and its severe negative implications for the Company and its primary drug candidate. For example:

(a)     On December 14, 2021, the *Boston Business Journal* published an article titled "Hopes dashed, shares slashed: Adagio drug looks ill-suited to omicron."  The article noted that "two weeks ago, Adagio Therapeutics Inc. CEO Tillman Gerngross was confident that his company's experimental antibodies would 'neutralize SARS-CoV-2 and all its known variants.' But new data suggest otherwise."  The article noted that Adagio's announcement in the November 29 Press Release that Adagio believed none of Omicron's mutations would enable it to escape ADG20 was "[c]learly . . . premature."

(b)     On December 14, 2021, the *Boston Globe* published an article titled "Adagio stock plunges by almost 80 percent after data show its experimental antibody treatment doesn't work against Omicron; The Waltham company's disappointing findings come just two weeks after an upbeat report."  The article noted that Adagio's valuation had doubled to $5 billion on the favorable pronouncements of drug efficacy contained in the November 29 Press Release.  The article summarized the December 14 Press Release and stated that "a lab test

- 14 -

assessing neutralizing activity found that Omicron caused a more than 300-fold reduction in how well ADG20 could fight the virus, compared with the earlier results."

49.     Adagio has subsequently shifted its focus away from ADG20 to other prospective antibody treatments based on adintrevimab, the Company's investigational monoclonal antibody, and suffered a wave of executive departures.  By the end of 2022, the price of Adagio stock had fallen to less than $1.50 per share.

50.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Adagio common stock, plaintiff and other Class members (defined below) have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Adagio common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Adagio common stock was actively traded on the Nasdaq Global Market.  While the exact number of Class members is presently unknown to plaintiff and can only be ascertained through appropriate discovery, plaintiff believes that they number in the hundreds or thousands.  The names and addresses of the Class members can be ascertained from the books and records of Adagio or its transfer agent.  Notice can be provided to such record owners by a combination of published notices and first-class mail, using

- 15 -

techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

53.     Plaintiff's claims are typical of the claims of the other Class members, as all Class members are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

54.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation.

55.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the Class members and the appropriate measure of damages.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

57.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.

58.     The Individual Defendants, because of their positions with Adagio, controlled the contents of Adagio's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.   Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of Adagio's corporate statements and is, therefore, responsible and liable for the representations contained therein.

59.     Furthermore, on February 18, 2022, Adagio announced that defendant Gerngross had "agreed in principle to resign from his position as [CEO] of the Company."  Defendant Gerngross's resignation, which was followed by the departure of numerous other Adagio executives, on the heels of the disappointing news that ADG20 was not effective against Omicron, further bolsters an already compelling inference of scienter.

## LOSS CAUSATION

60.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Adagio common stock and operated as a fraud or deceit on Class Period purchasers of Adagio common stock by

failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Adagio common stock declined significantly as the prior artificial inflation came out of the stock's price.

61.     As a result of their purchases of Adagio common stock during the Class Period, plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Adagio common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $78.82 per share on November 30, 2021.

62.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Adagio's business, risks, and future financial prospects. When the truth about the Company was revealed to the market, the price of Adagio common stock fell significantly, dropping to below $6 per share by December 15, 2021, as the prior artificial inflation in the share price dissipated and causing real economic loss to investors who had purchased Adagio common stock during the Class Period.

63.     The decline in the price of Adagio common stock after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Adagio common stock negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

64.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of

Adagio common stock and the subsequent significant declines in the value of Adagio common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

65.     At all relevant times, the market for Adagio common stock was an efficient market for the following reasons, among others:

(a)     Adagio common stock met the requirements for listing and was listed and actively traded on the Nasdaq Global Market, a highly efficient, national stock market;

(b)     as a regulated issuer, Adagio filed periodic public reports with the SEC;

(c)     Adagio regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Adagio was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

66.     As a result of the foregoing, the market for Adagio common stock promptly digested current information regarding Adagio from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Adagio common stock during the Class Period suffered similar injury through their purchases of Adagio common stock at artificially inflated prices, and the losses they suffered when the artificial inflation was removed, and a presumption of reliance applies.

67.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims are grounded, in significant part, on defendants' material omissions.  Because this case involves defendants' failure to disclose material, adverse information regarding facts critical to Adagio's business and operations – information that defendants were obligated to disclose – affirmative proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged herein.  Defendants' false and misleading statements alleged herein were not forward-looking.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

69.     Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Adagio who knew the statement was false when made.  Moreover, to the extent that defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that defendants were actually engaging

in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

### COUNT I

### For Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Adagio common stock during the Class Period.

73.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Adagio common stock.  Plaintiff and the Class would not have purchased Adagio common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

74.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other Class members suffered damages in connection with their purchases of Adagio common stock during the Class Period.

**COUNT II**

**For Violation of §20(a) of the Exchange Act
Against All Defendants**

75.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of Adagio within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Adagio, the Individual Defendants had the power and authority to cause Adagio and its employees to engage in the wrongful conduct complained of herein.  Adagio controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 31, 2023                HUTCHINGS BARSAMIAN MANDELCORN,
                                        LLP
                                        THEODORE M. HESS-MAHAN


                                        s/ Theodore M. Hess-Mahan
                              _____
                                        THEODORE M. HESS-MAHAN
                                        (BBO #557109)

                                        110 Cedar Street, Suite 250
                                        Wellesley Hills, MA  02481
                                        Telephone:  781/431-2231
                                        781/431-8726 (fax)
                                        thess-mahan@hutchingsbarsamian.com

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        BRIAN E. COCHRAN
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101-8498
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        STEPHEN R. ASTLEY
                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL 33432
                                        Telephone: 561/750-3000
                                        561/750-3364 (fax)

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)

Attorneys for Plaintiff