UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

Laura L. Brill, et al,

                    Plaintiff,          Civil Action
                                        No. 23-CV-10254-JEK
V.
                                        May 10, 2024
Invivyd, Inc., et al,                    11:00  a.m.

                    Defendant.
_____




BEFORE THE HONORABLE JULIA E. KOBICK

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




JAMIE K. HALPIN, RPR, RMR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA  02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PLAINTIFFS:

Stephen R. Astley
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
561-750-3000
Email: Sastley@rgrdlaw.com

Luke Goveas
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard
Suite 720
Boca Raton, FL 33432
415-741-0055
Email: Lgoveas@rgrdlaw.com

Enoch Hicks
Johnson Fistel
40 Powder Springs Street
Marietta, GA 30064
470-632-6000
Email: Enochh@johnsonfistel.com

Theodore M. Hess-Mahan
Hutchings, Barsamian, Mandelcorn, LLP
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
781-431-2231
Fax: 781-431-8726
Email: Thess-mahan@hutchingsbarsamian.com

FOR THE DEFENDANTS:

Michael G. Bongiorno
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
212-937-7220
Fax: 212-937-7300
Email: Michael.bongiorno@wilmerhale.com

Peter J. Kolovos
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617-526-6493
Fax: 617-526-5000
Email: Peter.kolovos@wilmerhale.com

Elizabeth E. Driscoll
Wilmer Cutler Pickering Hale and Dorr LLP (Bos)
60 State Street
Boston, MA 02109
617-526-6278
Email: Elizabeth.driscoll@wilmerhale.com

Jocelyn M. Keider
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617-526-6823
Email: Jocelyn.keider@wilmerhale.com

**P-R-O-C-E-E-D-I-N-G-S**

THE CLERK:  All rise.

(The Honorable Court Entered)

THE CLERK:  This is Civil Matter 23-CV-10254, Brill, et al v. Invivyd, Inc., et al., and will Counsel, starting with the plaintiff, please state your name for the record.

MR. ASTLEY:  Good morning, your Honor.  How are you?

THE COURT:  Good.  How are you?

MR. ASTLEY:  Well.  Stephen Astley joined by Luke Goveas.  We're with the Robbins, Geller, Rudman & Dowd Law Firm on behalf of the lead plaintiffs.

THE COURT:  Good morning, Mr. Astley.

MR. HICKS:  Good morning, your Honor.  My name is Enoch Hicks also on behalf of lead plaintiffs.

MR. HESS-MAHAN:  I'm Theodore Hess-Mahan here as local counsel for the lead plaintiffs.

MR. BONGIORNO:  Good morning, your Honor.  On behalf of the defendants, Mike Bongiorno, from Wilmer Hale.  Peter Kolovos, Lizzy Driscoll and Jocelyn Keider are with me.  Good morning.

THE COURT:  Good morning.  We're here on defendants' motion to dismiss.  Mr. Bongiorno, are you going to present for the defendants?

MR. BONGIORNO:  Yes, your Honor.

THE COURT:  Okay, so I will have you go first and then have the plaintiffs' respond and give you a brief rebuttal.

MR. BONGIORNO:  Thank you.  Again, my name is Mike Bongiorno on behalf of all of the defendants in this matter. I'll refer to the company as Adagio.  It's now known as Invivyd, but in the complaint, it's referred to as Adagio.  So for everybody who has been reading the papers and is used to seeing Adagio, I'll use that name.

THE COURT:  Sure.

MR. BONGIORNO:  As the Court is aware from the parties' submissions, these issues all revolve around things that happened in the Fall of 2021 when the COVID pandemic was starting to slow down but then the Omicron variant cropped up and emerged and people were starting to focus on that.  In the early days of the emergence of this Omicron variant, Adagio made a few statements, November 29 and December 1 of 2021, and that's what this case is about.  It's a very short class period, it's a very contained case, which is sort of unusual in this area, but nonetheless, here we are.

Adagio made a couple of statements about its expectations and what it anticipated with regard to what its lead candidate product, ADG20, as it was referred to, as to what it thought that ADG20 would do with regard to neutralization of the Omicron variant.  It said, it expects that it will retain activity, it anticipates it will remain neutralizing,

statements such as that; and as we have explained in our papers, your Honor, those types of statements, expectations, anticipation, they're forward-looking, they're scientific opinions, and they're non-actionable and many courts, many decisions in this district, have held that for some time.

THE COURT:  So I want to stop you there because I had a couple of questions about whether they were forward-looking statements and which statements we're talking about.  So, as I understand it, the definition of forward looking statement is in the statute, Section 78u-5.

MR. BONGIORNO:  Yes.

THE COURT:  And I just wondered, especially for the press release, but I'll ask you about the CNBC interview and Boston Business Journal and the other statements, how those statements fall into the definition of forward-looking statements, you know, just looking through Subpart (a), a statement containing a projection of revenues, this isn't really about revenues, a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services.  I am not going to read the whole definition, but I just -- the press release in particular strikes me as a statement about how Adagio expected ADG20 to perform vis-a-vis the Omicron variant, but it's not really about revenues or financial projections.

MR. BONGIORNO:  Certainly, and many, many cases that

apply the PSLRA have nothing do with revenue projections. Although, certainly, way back when in 1995 when that statute was adopted, and I was practicing law at the time, most of the cases that we saw, particularly here in Massachusetts, involved revenue projections, a lot of biotech companies that would have these sort of hockey stick quarters and then they would eventually have one that didn't hit their revenue target and the statute sort of started out very focused on that, but particularly here in Massachusetts where we have so many biotech companies, the PSLRA forward-looking statements have been applied to projections, expectations, anticipation about clinical trials many, many times.

THE COURT:  So what are -- cite me, what are the best cases for that?

MR. BONGIORNO:  Sure.  The Hackel v. AVEO case from 2020 in front of Judge Burroughs is a good example of that. AVEO was developing a drug for renal cell carcinoma, and there were different endpoints to the trial.  There was a progression survival endpoint, there was an overall survival endpoint, and AVEO made statements about what it expected and hoped and anticipated might happen with those trials, but there are many, many areas.  Karyopharm is another one which was Judge Gorton and was affirmed by the First Circuit in 2020, if I remember correctly.  I argued it during COVID, but the cases like that, and many, many others, your Honor, in this district.  Sarepta

is another.  There are many, and they look at what the company is saying about its drugs and development, products and development, and whether or not they may ultimately obtain FDA approval, whether or not they'll hit their primary endpoint, whether or not they'll be safe.  Things like that are all forward-looking statements about expectations, anticipation, hope, and that I think it was Judge Kelley, although I can't remember who was analyzing these cases, that said and distinguished some where courts said that even though they're forward-looking, they are actionable, and one of them was a case called Transkaryotic Therapies, TKT, which was in the early 2000s where the CEO said something like, approval is a when, not if, proposition and the Court in that case was Judge Zobel that said, well, that's basically guaranteeing that the drug is going to be approved, not saying you think it's going to be approved, you expect, you hope, you anticipate, whatever. So that was an example of a situation where the court allowed the case to go forward.

     And in the earlier AVEO case, there were two of those. The first one was in front of Judge Casper which was in 2015 or '16, something like that, and in that case, the issue was that the disclosure about what was going on with the clinical trials and what the FDA was telling AVEO did not necessarily line up perfectly with what the disclosure said.  There are a few things that were left out, and the judge allowed that to go

forward, but the later AVEO case was in front of Judge Burroughs.  That was purely forward-looking and the Court dismissed the case with prejudice on the first amended complaint.

In the language that's used here, to get back to Adagio, we expect that ADG20 will retain activity against Omicron and Adagio anticipates that ADG20 will contain neutralizing activity against the Omicron variant.  So those are very much forward-looking in nature.

THE COURT:  So those are from the press release, correct?

MR. BONGIORNO:  Yes.

THE COURT:  I'd like you to just take me through.  Are you arguing that the CNBC statements are also forward-looking and the Boston Business Journal and the statements made on December 1?

MR. BONGIORNO:  Sure.  So there is certainly different aspects to these statements.  We can look at each of them specifically for sure, your Honor, and challenged statements in the CNBC statements are a little bit different, but again, it is all in the nature of forward-looking because no one, no one here is being accused of saying something was false on its face and in fact, the plaintiffs concede that in their brief.  Their whole point is well, you said these things but you didn't have a basis for it, you didn't have an adequate basis for it, and

therefore, it was reckless or they try to put this under the Omnicare case and say it wasn't meaningful and all of that and I'm sure we will talk a little bit about that today.

But in the CNBC interview, Dr. Gerngross is really talking about how this particular antibody was developed and why, you know, they don't think it will be affected by the most recent mutation. So while there were certainly aspects of each of these statements that are in the present tense, you know, it targets a highly conserved epitope and shown to be resilient to date.

THE COURT: I will stop you there because that particular statement struck me as, it has shown to be resilient to date against any of the variants that have emerged, you know, at that point was Omicron -- was he talking about Omicron as a variant that had emerged? And then moving into the next statement, it's sort of a fusion, what we know is our antibody, based on sequence analysis, is likely to bind to Omicron and not lose any of its neutralization potency. That strikes me of something of a hybrid between a forward-looking, likely to bind, but what we know, based on this analysis, so talk me through why you view that as a forward-looking statement and the one prior to.

MR. BONGIORNO: Understood, your Honor. So I'm not arguing that every word that was said is forward-looking in this statement, but the part of it that matters, the part of it

that the market is paying attention to is, is this thing going to work against Omicron, and we did not say it works again Omicron, we've proven that it works, we have the data to support that. What he says here is, it's shown to be resilient to date against any of the variants that have emerged and then goes on to talk about Omicron and says likely.

THE COURT: Right.

MR. BONGIORNO: Likely to bind. So that is undoubtedly forward-looking because what he's saying is we don't know yet, and what he had said two days before or actually that day, what the company had said that day, that was November 29 -- I stand corrected - in the press release, was we're testing it in vitro or we're having it tested in vitro. Oxford was doing that, and we'll announce the results by the end of the year. Could not be clearer that we don't know yet. Anticipates, expects, likely, those are all words that courts have found are ways to identify what's a forward-looking statement.

THE COURT: Can you clarify for me, is the in vitro testing different from the sequence analysis?

MR. BONGIORNO: Yes.

THE COURT: Okay, so he was saying we're going to be doing future testing through Oxford, you know, through the press release, but here it was sort of a backward looking of what we know is our antibody, based on a prior sequence

analysis, which was different than what was going to happen in the future?

MR. BONGIORNO:  Sure.  Yes, your Honor.

THE COURT:  Okay.

MR. BONGIORNO:  And, you know, when Adagio made its statement about its expectation in that press release, it said very specifically what it was based on.  So forward-looking or not, it's a whole lot different than the Omnicare type of cases that find that maybe there wasn't a meaningful inquiry here and the case would go forward.

THE COURT:  I have some questions on that, but before you get to that, can I continue to a few questions on forward-looking.  I understand I need to look to the context around these statements, and one question is how do you divide up context?  Am I looking at the press release as a whole and then separately with the CNBC statements as a whole and then separately the Boston Business Journal statements as a whole for context or is your contention that I should look across -- you know, we're talking about a three-day period, across that whole period as the context annotating statements?

MR. BONGIORNO:  Well, you certainly have to look at the whole context, your Honor.

THE COURT:  Temporally, where does the context divide?

MR. BONGIORNO:  Well, the market hears all of that, right?  So it's not as though the CNBC statement was made in

isolation or whatever -- the Boston Business Journal is a little bit more convoluted because it's not direct quotations. It's a little more difficult to distill that, but I will say in the first instance, I don't think it matters in this case because I think regardless of how you look at it, the outcome is the same, but I would suggest that in this context where there is an interview the same day as the press release and then there is an article in the Boston Business Journal a couple of days later, that that's all part of the same context that should be looked at holistically, but you can certainly do it statement by statement and parse it and I think the result ends up ultimately the same.

THE COURT:  The one question related to that is if you're an investor, I guess I'm looking to the reasonable investor, would you expect that the reasonable investor would be aware of the different statements?  You know, if you turn on CNBC, you might see the interview or you read the press release or you might not see them all.

MR. BONGIORNO:  Sure, and that would be true if this were an individual action, I think we might think about it a little differently, but here, where the plaintiffs are undoubtedly relying on fraud-on-the-market theory and they're assuming they need to have a class action, that all relevant material information is incorporated into the stock price over a day or two or three or whatever ends up being in a case like

this, that the market doesn't hear these things separately, and you know, sure, an individual investor might read the Boston Business Journal or watch CNBC and read the press release or two or three of those, but the market hears all of it and incorporates all of it in there.  So, in that regard, I don't think that the question is as germane to a class action as it would be to an individual action, but it's certainly a fair question and part of the analysis that we all do here.

But, again, the context is the context, and the interview, the CNBC interview, was said in the context of the press release which obviously has more detail and goes into more of the bases for the opinion which I think -- or the projection opinion, whatever you want to call it, whether you want to analyze it under Omnicare or under the PSLRA, it's all there.

The defendants said what their relief was and they also said what the bases for their relief was which was a lot different than some of these cases that you see like the Carbonite case from this circuit where a projection was made and nothing was said about the basis for it, and there is an assumption under Omnicare, I suppose, that something was done to support that opinion.

Here, the defendants stated exactly why they were saying what they were saying, and the plaintiffs said well, that's not good enough, and so they were sort of doing the work for us in that regard because they're putting the scientific disagreement

out there.

THE COURT:  So let me -- I had a question about that also which is if you look at Paragraph 28 of the complaint, and it strikes me as an important paragraph because, you know, it says it's widely, I'm paraphrasing here, I am not going to capture it totally accurately, but it's accepted amongst virologists where you have a new mutation and it has been shown in prior strains to have particular characteristics, you would assume it would have the same behavior in a future strain but where you have a few variants with different mutations that, haven't been studied it should not -- now I'm quoting, "it should not be assumed, absent clinical testing and confirmation, that the variant lacks the viral escape characteristic."  On a motion to dismiss, if I have to take that as true, why shouldn't I then kind of draw the inference that there was some duty to do the clinical testing or to, you know, withhold statements until there was some confirmation that ADG20 would in fact neutralize Omicron?

MR. BONGIORNO:  Sure, your Honor.  The law does not suggest that you would need to do that in these circumstances and I think it's pretty clear, but I'll give you a few examples of cases that I think are important.  Let me start with one that is so recent that it's not in our reply brief.  I think it's a very important one.  It's the Homology case that Judge Kelley decided about three or four days after we filed our

reply brief. The Westlaw cite is 1436025, obviously 2024, and she talks a lot about what needs to be disclosed and not disclosed under the circumstances, and it's an interesting case in that there were -- the company disclosed the results of the first three patients that were being tested for whatever was going on in that particular trial. They actually had the results of two more after that but they very clearly stated here is what happened with the first three, and Judge Kelley dismissed the case even though Patients four and five did not have good data and good results, the first three did, and that's an analysis under Omnicare that cites the Sarepta case, and she says, "Homology had no duty to disclose data in realtime." So questioning sort of the science and the analysis of the science is not something the Court needs to get into if the company is clear about what it's doing.

Now, in Sarepta, similar circumstances, the plaintiff in that case, and it was affirmed in the First Circuit, and that was Judge Talwani, and in Sarepta, the defendants modified the group of patients that they were treating. That was a Duchenne muscular dystrophy case, and they took two of the patients out of the trial because they could no longer walk. They weren't ambulatory which is an important data point for testing for DMD which affects typically young boys. So in that case, the defendant said, we have a modified intent to treat group, mITT, modified intention to treat group. I'm not great at acronyms

but I'm trying, and so they said that.  They said here is what we're doing.  We're giving you data on these, I can't remember the number, let's call it ten, instead of the original twelve, and the plaintiffs came in and said, you can't do that.  What about these other two?  If you include the other two, the data is not so good.  You can't do that.  This is bad science. Don't give us this data on these ten.  We need to know all of it.  And the Court said, no, you said what you were doing, and if you said what you were doing and it's accurate, then, you know, you can come in and say that's not good science, that doesn't work, but it's up to the market.  It's not up to plaintiffs or the court.

THE COURT:  I guess my question for you though is in those cases was there an allegation in the complaint about the scientific standard for this particular, you know, line of research or this particular domain of science because here, you know, I have an allegation about what's accepted scientific practice amongst virologists which strikes me different than those contexts.

MR. BONGIORNO:  Well, I don't think it's -- respectfully, your Honor, I don't think it's different at all. We see that in every one of these case.  In Karyopharm, it was you did it all wrong.  What you did was wrong.  There was no chance the FDA was going to approve this clinical trial because you messed it up.  In Sarepta, they said that, you know, you're

submitting data that is not valid because you eliminated two people. In all of these cases, they argue the science, and so this allegation is far from unique. In fact, it is rather benign compared to some of the stuff. In Karyopharm, they said the FDA was sending criminal investigators to the company to determine what they were doing in the database to mess around with it.

Some of these allegations are pretty severe relative to this which is basically like, well, you should have known that you know, you could have looked at it this way, and if you looked at it this way, you should have waited. There is no duty on a company to do the perfect science. In the Sarepta, and a number of cases in this district, the Sanofi case with Judge Engelmayer out of the Southern District of New York. There is no duty to conduct perfect science, and it's not as though we said we had done these things and we hadn't done them. That would be a problem, and it's not as though we knew the results and we said we think it was going to work anyway which is, by the way, what this complaint said originally. Pretty, you know, significant allegation that these individuals knew the results were bad and said what they said. They had to withdraw that, of course, once they got their FOIA response and said that we didn't know, but nonetheless, they proceeded and so here we are.

But an argument about what should and shouldn't be done

can't get past a motion to dismiss.  Every case would get past a motion to dismiss if all they had to do was say here is something you could have done or you should have done but you didn't do and what you did wasn't good enough.

THE COURT:  But I think, you know, I think in fairness they do more than that in the complaint, right?  They have a lot of allegations about the nature of Omicron, the unique mutations, the locations of those mutations, the statements from Dr. Fauci or Gerngross and I know those were kind of balanced statements but there is more than just you did bad science in the complaint.

MR. BONGIORNO:  So I guess -- fair enough, your Honor, I guess I don't necessarily agree with that because I think that is exactly what they're saying which is -- and maybe not even that much because what they're saying is you did what you did and you said it accurately but that's not enough and that's for the market to decide, right?  I mean, the market, we could come out and say we did -- we tested this drug on one patient and so far so good but we need to do a whole lot more.  That's not fraud.  That might be not even close enough to get approved from the FDA but that's not fraud.  You said what you did and that's what we did.  We said here is what we've done so far. Here is what we know and the mapping, the fact that it's a conserved epitope and appears in all of the different Alpha, Beta, Gamma, Delta variants to this point and it's there again

in Omicron and we're going to look at it in vitro and we're going to give you the results by the end of the year. We're saying exactly what the bases are for our opinion and/or projection. So the notion that that's not good enough is not what the law says in the Omnicare case. That case was about somebody saying, you know, we believe we complied with the law and there was apparently not a sufficient basis for saying that or Carbonite where they said, whatever they said about their projections, they hadn't done anything and the product never worked and all of that. That's not this case where there was some secret thing that somebody thought we had done. They're not claiming that the market thought we had done this. They're suggesting that that was necessary to say it, but we never suggested that we had done the things that they say we should have done. We said exactly what the bases were for our opinion and that we were about to do what was -- what needed to be done to confirm that, and unfortunately, the results of that were not good and we disclosed that in three business days.

We can talk about the duty to update, if you'd like. I think that that claim really goes nowhere and not a single case that they're citing to that point, that we needed to disclose the results immediately.

Again, Judge Kelley's case that I just mentioned she says, "Homology had no duty to disclose data in realtime," and that was talking about Patients four and five, the information of

which the company had in its possession for some time and that case was dismissed.

So I think that this case is really not close factually in terms of the significance of the allegations. There are a number of cases that had been dismissed, never mind the cases that haven't. So on all of those points -- and there are a number of, obviously, avenues and off-ramps to this case. It's you know, if it's an opinion, is it actionable under Omnicare if the company discloses all of the bases for its opinion and says it's going to do more just because the plaintiffs say that's not good enough, you can't speak until you know. There is no law that says you can't speak until you know. The market is entitled to hear from what they acknowledge is an expert in this field. The market is entitled to know what we think at that point in time. We said what we think, we didn't promise it and we said what the bases was for it. So under Omnicare it fails.

Also, forward-looking, plenty of cautionary language, it fails under that standard as well, and of course, we haven't even talked about scienter. There is absolutely no motive here. There isn't even close to a motive here. There was no allegation -- there was, it was withdrawn. There was no allegation we knew it wasn't going to work so.

THE COURT: So talk me through why even still if you're just looking under a recklessness standard, you know,

you have professionals who are highly educated experts in the field, can look at Omicron and understand that it's a different kind of viral strain, would presumably be aware of Dr. Fauci's statements and the other statements expressing that, you know, antibody treatments might not work as well.  Why, in your view, is it not at least reckless to have made the statements that are at issue here?

MR. BONGIORNO:  Recklessness is a very high standard, your Honor, and in this circumstance -- look, if all we had said was we think it will work or we expect it will work, then maybe they'd have a better case, maybe, but when we say we expect that it will work and we say why, "based on published epitope mapping and structural studies, Adagio anticipates that ADG20 will retain neutralizing activity against the Omicron variant and none of the mutations present in the spike protein are associated with escape from ADG20."

THE COURT:  That's all from the press release, right?

MR. BONGIORNO:  Right, yes, and going on to say -- then, of course, there were specific cautionary warnings, and then goes on to say in vitro testing is underway and expect the results by the end of the year and it's recruiting patients in South Africa to generate clinical data.  That's hardly reckless, your Honor.  That's basically saying here is what we think and here is why we think it and here is what we're going to do, and you know, in this context, where we're in the middle

of the pandemic, there is a new variant out there, people are talking about it, Dr. Fauci says that it might not work on these, and we say, well, we expect it to and here is why but we're going to test it, and we said by the end of the year, and by the way, 10, 12, 13 days later we announce we did it and it doesn't work; and in the meantime, there is no trading, there no capital raise, nothing.  Like, in say Tetraphase, for example, the time in between the results that were received and the announcement was made, there was a very large trade.  It was a --

THE COURT:  That's not here.

MR. BONGIORNO:  Sorry?

THE COURT:  I understand there are no allegations like that here.  Talk me through the same argument as to the other non-press release statements.  Why should I not find that they at least met the pleading standard as to recklessness as to those statements?

MR. BONGIORNO:  Because those statements, your Honor, are quite similar to the original one with much less specificity, right?  We know -- "what we know is our antibody, based on the sequence analysis, is likely to bind Omicron and not lose any of its neutralization potency."  There is nothing false about that statement.  There is nothing reckless about that statement.  Based on the sequence analysis, what we know is that based on the sequence analysis, it's likely to bind,

but again, they're talking about being resilient to date and what it's likely to do, and in the context, of course, of a press release that was issued that same day, we all understand what that's talking about.  So there is really not much there.  Twelve-day, thirteen-day class period based on what we know and what we think is likely, I've never seen a case like that.  They can't cite a case like that.  This is in the middle of a pandemic, people wanting to know what's going on, us giving our best estimate of what we think is going to happen and why, and you don't even have to get to scienter, respectfully, your Honor, because of everything I said previously about the context here and about the opinions, same thing about the fact that they're forward-looking.  It's certainly forward-looking to say likely.  Likely means we don't know but we'll know soon in this context for sure.

And the other statement from Boston Business Journal, which isn't really much of a statement, is the context of them describing how they developed this drug and why they developed it and, you know, what the purpose was and the goal was with regard to developing this drug.

THE COURT:  Okay.  Thank you, Mr. Bongiorno.  Mr. Astley, are you arguing?

MR. ASTLEY:  Yes, ma'am.

THE COURT:  Okay, and then I'll give you a brief rebuttal.

MR. ASTLEY:  Probably the most important thing I might say, your Honor, this morning I understand you have an upcoming investiture and congratulations.  It's an exciting time for you.  It's a real pleasure to present for you today.

THE COURT:  Thank you.

MR. ASTLEY:  Mainly what plaintiffs heard this morning was a whole lot of factual disputes and not giving my clients the benefit of the doubt in terms of the allegations and drawing all reasonable inferences in their favor and trying to resolve disputed facts as to reasonableness, meaningfulness, the bases or lack thereof that was supposedly disclosed.  There are no rules of law that govern the resolution of those issues.  And, fundamentally, from plaintiffs' position, what you have here is you have an intersection of permissible commercial speech, defendants' point of view, with impermissible aggrandizement in violation of the securities laws, and what is the relevant consideration for when you fall to one side of the line versus the other side of the line, and to us, it comes down to a factual basis.  Did the defendants have a reasonable basis for rendering the statements that they did?  And I think to that point, the answer is a decided no, but context is incredibly important.

If you go to the World Health Organization's designation, Omicron as a variant concern, on November 26, it was only two days later that your Honor noted where Doctors Collins and

Fauci on Meet the Press and Fox Sunday were warning members of the public and the scientific community that there was a strong suggestion quote-unquote that Omicron would evade neutralization of existing monoclonal antibody therapies which included, of course, ADG20; and the critical point vis-a-vis Adagio is this is their only potential commercializable product.

So this is Thanksgiving weekend, it's Sunday, and by Monday morning, they have a fully proofread SEC filed 8-K pushing back against Doctors Fauci and Collins that their product works and they are distinguishing their product from competitors, and Dr. Gerngross is actually able to get in contact of the producers of The Exchange, the CNBC show, and get on national television all within 24 hours, just like happened generally speaking in the Matrixx case, which the Supreme Court easily found scienter to push back against the narrative that the product may not work, and that's the motive that happened here.  This happen in the blink of an eye.

So to the other point that your Honor mentioned, Omicron was decidedly different.  If you look at Alpha and Beta and Gamma and Delta, there were relatively few mutations, on the order of ten or so, none of which were in the epitope, which is the targeted location within the receptor binding domain of the spike protein which is relevant for their monoclonal antibody therapy, ADG20, but then you get Omicron and there is three

times the number of mutations, there are now triple the number in the RBD and four -- there were none before.  Now there are four in the very epitope that ADG20 targets, and despite that, they're on the talk shows and in written media pushing back against that the very next day, and I think at that point the statements are incredibly important.

THE COURT:  Well, they might be pushing back, as you allege, but talk me through why, especially the press release, it isn't forward-looking.  I mean, it does have all that key language, "we expect that it will retain activity against Omicron, we anticipate," and then, you know, there is a lot of cautionary language towards the end of the press release, and you know, an investor looking at this looking at this understands there will be clinical research that's going to happen in the future.  Why isn't that enough to put an investor on notice?  We're not claiming in fact this will neutralize or ADG20 will neutralize Omicron.  It's just based on prior research.  These are the company's expectations.

MR. ASTLEY:  I think there is two points.  One is legal, and I will refer your Honor to the Carbonite decision 2021 from the First Circuit, very similar statements, although, in the software context.  We think our product will be successful.  We think it will be a strong product.  We think it will work.  We think it will provide a competitive edge.

THE COURT:  But in that case, excuse me for

interrupting, there was no basis for the company to believe that it would work because the product hadn't ever worked.  I mean, here you had a track record of a treatment that had been effective against the prior strains of COVID, right?

MR. ASTLEY:  Which is Paragraph 28, your Honor.  That's the problem.  We agree with you.  It's a critical paragraph, and I think to your Honor's -- the implication of your Honor's earlier comments, that is and was our way of thinking a major concession by my dear friend here that the sequence analysis, the mapping, the structural studies, they're distinct studies from the Oxford work.  So the impression, the misimpression, these defendants were leading investors to believe is that there was existing data that connected the efficacy of ADG20 to Omicron, not to Alpha or Beta or Gamma or Delta, but there were -- we know there are existing structural studies.  There are mappings.  So, therefore, based on that, we expect or we anticipate or Gerngross in the exchange program said, "will neutralize all known variants."  He didn't say we expect.  He said, it will "neutralize all known variants."  Of course, that included Omicron.  That's Paragraph 56.  And so the concession is --

THE COURT:  You're pointing to the CNBC?

MR. ASTLEY:  Yes, that's right.  All statements are contained in Paragraphs 50 through 58.

THE COURT:  He said, we know our antibody based on

sequence analysis is likely to bind.  That also strikes me as looking forward and making a prediction there, right?

MR. ASTLEY:  I will refer your Honor to Paragraph 56 where he goes on to say will neutralize COVID SARS-CoV-2 and all known -- I apologize -- you're right.  And will neutralize all known VOCs, variants, which, of course, at that time includes by implication, if nothing else, Omicron.

And so I think the first point is the First Circuit said in the Carbonite case, when the company was describing its present sense beliefs of an existing status or product, there the WME software products, you can't retrospectively declare that forward-looking statement.  It doesn't work.  These folks were describing their then existing, present sense belief of a then existing product and what they expected.  That's not forward-looking, and of course, Stone & Webster, the First Circuit as all the circuits say, you have to disaggregate in any event.  You take the forward-looking parts, see if they're covered by the safe harbor and then you take the non-forward looking aspects and they have no implication under safe harbor protections.

THE COURT:  So let me stop you there.  I have the same question for you about context, the context of these statements.  We're talking about a three-day period, the news is moving quickly, and I take Mr. Bongiorno's point that this is a class action, we look to -- we assume an efficient market.

Why shouldn't I look to all the statements as one kind of coextensive representation of the company's expectations for ADG20?

MR. ASTLEY:  I think it's a principle of law.  You have to deconstruct them because of the fraud-on-the-market presumption.  There is a realtime alleged false statement, that in realtime pursuant to vis-a-vis Levinson on the fraud-on-the-market theory incorporating into the price of the stock at that moment or readily thereafter, people are trading on that news in realtime.

So the stock is obviously adjusting in realtime.  You have an intervening day or two.  You have additional statements on December 1.  Those are additional false statements or perhaps remediating statements depending on what the case may be.  That's not prices adjusting up or down.  So I don't disagree that there is a context holistically to be applied, but at the same time, because of the nature of the stock market and the millions of trades happening instantaneously, the context flows from the statements as they're made.  So given that the press release and the exchange interview happened within the same trading day, it might make some sense even though there is a discord in terms of the timing of those two events.  They're in the same trading day.  So it makes some sense to evaluate the context of those statements collectively because investors are trading, buying or selling on November 29, but then for the

30th, the 31st and the 1st, there is intervening days there where the December 1 statement hasn't come out yet.  So then you have to group the December 1 statements separately, and of course, everything done December 1 should be given in context because then traders are trading on that information, and then when the revelation occurs on December 14, you view those holistically, did it move the stock up or down and that's sort of had you disaggregate but you do evaluate it all in context.  So I agree with that aspect of that.

But I think the basic point that we're making on Safe Harbor, there is a technical defense, 15 U.S.C.78u-5, and if you want to benefit from the technical defense, you have to abide by the technical defense and the first of which is the very definition.  It's a forward-looking statement.  Omissions aren't covered by definition.  Judge Talwani points this out in the OvaScience matter that we cite, and this case is primarily concerning omissions of material fact.  So now you've been covered, but at the same time, it's got to be forward-looking.  The First Circuit said, present sense expectations and belief about an existing product aren't converted to forward-looking status simply because there is some potential impact down the road because in realtime you're providing investors your then existing beliefs for an existing product.

So in plaintiffs', from our point of view, that's a present sense statement.  That's not even covered, but even if

you wanted to carry this through under the PSLRA, safe harbor provision, you have to have meaningful, cautionary language, and the cautionary language is that future scientific results may alter our understanding of the efficacy.  It says nothing about the then existing basis that these defendants had for structural studies, mapping, sequences which, according to counsel, are distinct from what Oxford was doing.  They were clearly leading investors to believe there was some basis of scientific information from which they were informing their expert opinions, as your Honor mentioned.

Dr. Gerngross is a dual Ph.D. in immunology and microbiology.  Dr. Walker is a Ph.D. in microbiology.  They are experts in this field, and they're talking to investors, reasonable investors, lay people, and they are putting their imprimatur of expertise when they say based on sequencing what we know these things are likely to bind, will cover all known variants including Omicron.  Those are hardly unclear statements, and the proof is in the pudding.  Lawyers are lawyering.

THE COURT:  Can I stop you there?  All known variants, and I think there is a similar -- that's from the Boston Business Journal statement?

MR. ASTLEY:  Sure.

THE COURT:  A similar question about the CNBC interview statements that I think in context those showed or

could be read to refer to the prior variants, not Omicron.  I take your point that Omicron at that point was a known variant, but I think read in context, you're drawing a distinction between prior strains and the new one.

MR. ASTLEY:  What I would say to that point is you don't have to rely on me, your Honor.  You don't have to rely on my good friend.  Go to Paragraphs 64-B and C.  You have sell-side investors, Jefferies and Guggenheim, that are commenting on the revelation that ADG20 didn't work and both of these sell-side analysts, they can buy, sell, make recommendations, say, wow, this is shocking news that ADG20 doesn't work.  Just two weeks ago we were told Jefferies predicated based on strong data from mapping.  That's Paragraph 64-B.  Guggenheim in 64-C, the results are a surprise given that prior mutations, according to Dr. Gerngross, were not associated with escape based on prior neutralization studies.

So the market is linking the defendants' prior statements, not with Alpha, Beta, Delta or Gamma, but with Omicron and if the investors were adequately warned and understood that the defendants did not have a scientific basis, they would not be putting in public analyst reports that they're surprised that the thing doesn't work for Omicron.  They were led to believe something that wasn't true.

And I think, and this ties back to where my friend started off with, there is a whole host of cases that they cite,

Homology, which I just got this morning for the first time. It's just part of a long line of cases, but it's decidedly different.  Every single one of their scientific dispute cases, Homology is a good example as we covered this morning, you have an FDA situation where there are literally clinical studies underway.  In Karyopharm, it was literally disclosed that they removed the patients from the population.  So, of course, there is no falsity.  Plaintiffs say you should have told us anyway, but of course, there wasn't a duty there because they told you they excluded, but really, cutting through all the noise, you have a scenario where the company reasonably believes based on its scientific process that it has a good product, and later on the FDA, whom no one is in control of, disagrees for some reason and says, hey, more studies are needed or you're not going to get approval.  That has nothing to -- there was no FDA clinical studies here.  There was no analysis underway.  Our whole point with the mITT allegations in 59-H are not to say, hey, these guys should have done that so they're reliable, fraud by hindsight.  It's that you could have done that very analysis if you wanted to have a bases, but if you didn't want to do so, that's fine.  There is no duty to do good science, but then you have to tell investors you haven't done that analysis, just like the Oxford studies

THE COURT:  Wouldn't you read the press release to suggest they haven't done that analysis?  I mean, they talk

about prior analyses and disclose that studies will be ongoing and this was happening in realtime and fast developments.  I don't think an investor would have expected an analysis of Omicron as the database statements, right?

MR. ASTLEY:  Well, they did.  Stocked went from $25 to $50 based on these statements and fell from $35 to $7 to $1.50, and the company went out of business because of these very statements.  So the market absolutely understood, based on their expert opinions, that it was likely to work based existing data that we plead, accept it or not, the jury can disagree with me, that we plead in 59-G and D that there was no existing science.  There was no meaningful inquiry.  There was none of these studies.

THE COURT:  So I don't want to paraphrase your argument or put words in your mouth, but I understand you to be saying, you know, they could have chosen not to speak or they could have made more cautious statements about, you know, hoping that the ADG20 would neutralize Omicron, but here, these statements go further than that, and I guess my question for you is looking at, you know, we anticipate, we expect, why do you view them as having had some kind of duty to say less than what they said knowing that this was all happening in realtime and that they disclosed there would be research that was ongoing?

MR. ASTLEY:  The securities laws clearly say, there is

no dispute, little accuracy is not the standard of liability, the likelihood of misleading is, and when they chose to spoke -- speak and they didn't have any obligation to do so, they had to do so in a way that was not likely to mislead.  So when they suggested, based on their expert opinions, based on existing data, based on existing knowledge, based on existing epitope mapping that neutralization was likely to remain and anticipated that it would remain effective, that it would remain effective against Omicron, they were clearly misleading investors that they had some basis in the real world to make that opinion and that's Omnicare.

The question is not suggestive belief.  It's not goodwill. That's only one of the three schools for liability for opinion statements.  The second is did you conduct a meaningful inquiry or a reasonable investigation.  That's what, you know, was the issue in Matrixx.  And the third is did you omit other material facts from which a listener, the investor, could assess the reasonableness of your opinion.  I'm sitting here listening to these folks tell me in their expert opinion based on existing mapping, structural sequences and yada yada yada that they expertly think it's going to work, but they're not telling me, hey, that data pertains to prior variants, we hadn't considered it in the context of Omicron, that they're not doing the work that the MIT did for ADG20 which is a close analogue by their own admission.  They're not saying either thing.  They're

leaving the market the distinct impression that they have a basis.

So we're not arguing science here. Our point is and what we plead, rightly or wrongly, is this was no science. The fact that there was a prior mutation, G502, 504-D, Paragraph 28, does not mean the reverse is true, that the absence of that particular mutation gives you any scientific basis to provide an expectation of efficacy.

THE COURT: And that is the omission or one of the omissions you contend should have been included in the statements?

MR. ASTLEY: 100 percent, your Honor.

THE COURT: And, in addition, the unique characteristics of Omicron?

MR. ASTLEY: Yeah. I mean, of course, the unique characteristics were stated by Doctors Fauci and Collins, but the application of those unique characteristics to Omicron was not known. The defendants are the middlemen between those two points of view, and they provided the nexus to investors to link the new mutations never before seen particularly in the RBD and the epitope to efficacy of this potentially great new product and the stock price reacted, $25 and $50 based on that news. And, again, the motive here, just transitioning to the scienter element, is clear. They don't have to sell stock. I mean, that's Selling Option 101, to have a motive.

It's a short window because they can only keep the house of cards standing for so long.  They clearly were motivated to keep the balls in the air because of what Doctors Fauci and Collins said.  They did their campaign the very next morning, tried to keep -- hoping.  Of course, this isn't what this is.  At the end of the day, they were speculating.  They were very hopeful that the thing would work, and just two weeks later, less than two weeks because they got the information on the 9th, it didn't work and it all came crumbling down.

THE COURT:  Just to push back a little, isn't that sort of one of the policy goals between the PSLRA is we don't want to discourage -- Congress didn't want to discourage companies from conveying information to investors, and if it's couched as future statements or hope, as long as investors are aware of that, that's not fraud.  That's not problematic.

MR. ASTLEY:  So long as it's not designed to mislead and you don't do so in a reckless manner, but if you do so in a reckless manner, in other words, not having a reasonable or any scientific basis, that's a triable issue, and honestly, that's what happened in Matrixx.  You have Zicam, obviously a cold remedy product that we're all familiar with.  There was some anecdotal reports that it caused anosmia, a smelling disorder.  The company is like, wow, this is going to have an impact on our bottom line, and they engaged in a public marketing campaign to push back on that.  They went after doctors to say

you can't use our name.  They hired an expert to sort of create reports to counteract it.  And the Supreme Court said that's clearly scienter.  You know, you don't have to have stock sales.  Just the idea that you were motivated to, you know, recklessly deceive investors is enough to get the ball across the goal line, and that's pretty much what happened here.  They were trying to keep this company afloat, and as soon as the information came out, the whole balloon popped.  There was no more company anymore.  They changed the name to Invivyd, it had nothing to do with COVID, all because of the words they uttered on the 29th and the 1st.

And so it just simply is not correct as a matter of law and fundamentally unfair to my client to say, oh, these are forward-looking statements and, therefore, we get out of jail free.  That's just not the way the defense works, and then, oh, well, it's an opinion statement so you have the disbelief.  That's not even the law either.

The question is did they render statements?  Even if they happened to be literally accurate, which we would dispute, but nevertheless left a misleading impression on investors because they omitted information that would inform all of us to understand what they were saying, and they did say that Oxford was engaged in work, and that will be forthcoming, but they sure as heck made it seem like that was a different analysis.  That's what counsel said today.  Oxford was doing a different

sort of analysis.  Of course, the future could always change what your current understanding may be, but that says nothing about having a basis for your current understanding and that's where my clients are coming in.  My clients are saying it was unreasonable for them to have the current understanding that they did because there was no nexus between mapping and structural studies and sequencing with Omicron and they left that distinct impression, and that's literally what Jefferies and Guggenheim said when they put out their analyst reports.

So for us, there is no doubt they can have commercial speech and there is no doubt they can celebrate and cheerlead their products.  Every company does that, but you've got to do it in a way that's consistent with your reasonable understanding of the facts.  Investors, Omnicare care says, they assume that you have a reasonable investigation, you have some basis to what you're talking about, and if you don't, you're liable for what you said, and you didn't have to say it but you chose to say it.  So you should have done it carefully.  And that's where this case lies, and we would ask, your Honor to deny the motion dismiss.

THE COURT:  I want to just briefly ask you about your argument that Adagio had a duty to update sooner than five days once they received the Oxford data.  What is the basis for or the source of that duty and do you have any case law that -- you know, that's a pretty quick turnaround on a company

disclosing information.  What's the best case you have to support that?

MR. ASTLEY:  Well, first of all, not every circuit is the same on the issue.  So in the First Circuit it just happens to be very favorable to my clients.  There is both a duty to update and a duty to print, and in the press release, it says they're going to be forthcoming with additional results.  Whether or not three business days, five calendar days, however you want to do the math, is in fact reasonable, a jury question.  There is no statement of law that says you can disclose in three business days and you get out of jail free, but if you wait four, then you lose or if you say it in one business day -- they cite Baxter, for example.  Literally, the company received whistleblower complaints that in a Brazilian subsidiary, of course they're located in Chicago, that in a Brazilian subsidiary there is wrongdoing.  So, of course, they had to take time to assess the complaints and figure out what was going on in order to put out a public acknowledgment of their wrongdoing.

Here, Oxford is the investigators.  They hired Oxford to do the investigation.  They got the results back.  These experts are looking at, again, it says 300 full, 276, you know, full decrease in neutralization activity.  In plain English, it means it doesn't work, and that's what counsel admitted here today.

So they sat on this, almost 2 million shares traded over those five days, and we submit that is not only indicative of an intent to deceive, but it's a question for the jury as to whether it was reasonable.

THE COURT:  And in your view, it's just not reasonable for the company to have done its own independent analysis of Oxford's results because it had outsourced the analysis?

MR. ASTLEY:  Yes.  We plead they did not have the testing facilities.  It's all in Paragraph 59.  They just did not have any capacity to do this in-house.  So it's not like they even had the ability, other than Dr. Gerngross and Dr. Walker's preeminent scientific knowledge, they did not have the structural or logistic capability to redo the results.  Hey, did Oxford get it wrong?  That's why they hired Oxford in the first place.

So other than reading it and understanding the science of it, there is really, in our view, no reasonableness to have waited the five days, but that's the duty to update.  It doesn't speak to the other avenues of liability that we've discussed on the statements themselves, misleading nature of them, forward-looking.  Omnicare doesn't distinct from the duty to update.

THE COURT:  I understand.

MR. ASTLEY:  Thank you so much.

THE COURT:  Mr. Bongiorno, brief rebuttal?

MR. BONGIORNO:  Certainly, your Honor.  The company is not out of business.  Where that came from -- that's actually my daughter from the U.S. Attorney's office.  The General Counsel is right here in the courtroom.  She'd be surprised to hear that the company is out of business.  It's not out of business.

You just heard something about an intent to deceive.  That's new.  I thought this was a recklessness case up until about 60 seconds ago.  You asked the question about what cases support the notion there is a duty to update.  You did not get an answer because there aren't any.  Judge Kelley just said six weeks ago that the company in that case did not have a duty to explain what was going on in realtime.  That company took a whole lot longer than three business days to say what was going on with Patients four and five.  This is not a case with a three-day class period under any circumstances.  They got the results, they looked at them, they absorbed them and issued a press release; and according to, again, Tetraphase in that regard, and in the Tetraphase case, a 10b5-1 was triggered while the company had that information in its hands and it was a significant trade.  There was no motivation to sit on these results whatsoever.

Matrixx, I would distinguish it for you but he did it for me.  He went through a whole bunch of things that they did in that case that have nothing to do with what happened here.

They were selling a product.  They were trying to convince people that something works when it's just being tested.  There is no motivation.  It's not like people were out there buying ADG20 and we wanted to keep them buying it during the Omicron variant.  There is nothing like that going on here.

You also heard this notion that the cases that we cite are distinguishable because they're cases that involve FDA clinical trials and this case doesn't.  That's a strange distinction.  It has nothing to do with why those cases came out the way they did and they're not all FDA cases.  I'm testing my memory of the cases I've litigated, but Tetraphase, I'm almost sure, was not a FDA submission.  It was just a clinical trial, and the clinical trial failed and the company disclosed that.  It had nothing to do with what the FDA told Tetraphase or didn't tell Tetraphase about what was going on.

Some of the statements got a little synthesized here earlier.  All of the statements we've talked about this morning, and I misspoke, we're on November 29.  There was a statement on December 1.  We haven't talked about that yet today.  It is a pretty benign statement.  I don't think it supports anything close to a misrepresentation.

THE COURT:  This is the conference statement?

MR. BONGIORNO:  Yes, your Honor.  You didn't hear much about that statement because there is not much to that statement.  All of the statements we talked about were all on

the same day, and you heard, I don't know if it was a concession or what, but in your colloquy with my friend at the plaintiffs' counsel table, you heard him say that sure, everything that was happening on November 29 was all happening in the context of the stock being traded and that's all in the same context and all of these statements were on November 29 that we talked about and there weren't any promises on that day.  They were statements about likelihoods and expectations, and the notion that we thought that we were deceiving the public and that the public thought that we conducted the analyses that the plaintiffs say we had to have conducted in order to say what we said, makes absolutely no sense.  This is a very sophisticated group of analysts.  They heard exactly what we did.  Nobody thought -- you didn't hear anybody say we thought they did the MIT analysis.

THE COURT:  What's your response to Mr. Astley's point that they made allegations to investors who did express surprise that ADG20 didn't work to neutralize Omicron after the statements were made?

MR. BONGIORNO:  Certainly.  We all were surprised, your Honor.  Being surprised that something doesn't work is not indicia of fraud.  We expected it work.  It didn't work.  We were surprised.  We were disappointed.  So was the market. Nobody said they lied to us.  Even if they did, that's sort of irrelevant.  What matters is what was said at the time and

whether it violated the securities laws.  So what frustrated sell-side analysts saying after the fact is a little bit beside the point, but they didn't say we thought they had conducted this study that they didn't conduct.  We thought that they did in vitro analysis and it worked.  Why are they saying it didn't work.  They didn't say that.  They said, boy, these experts told us they expected it would work.  We thought it would work, and so now we're surprised and disappointed that it didn't work.  Everybody was.  This happens all the time.  It happens all the time right here.

You know, these companies, in Kendall Square or Waltham or in New Bedford or wherever they are around here, we all pride ourselves in having a great sciences community here in Massachusetts, and many, many of these companies raise a lot of money, they do very well and save lives, but some of them, their products fail, and when they fail, people are disappointed.  Of course, they're surprised.  No one is buying stock in any of these companies assuming it's not going to work, but sometimes it doesn't.  It's a very, very risky investment and no one knows that better than the sell-side analysts.  So relying on them to prove falsity here is quite a reach.  It's not a basis for a claim.

I'll just leave you with this, your Honor, and of course, answer any other questions you have, but to say in a situation like this where the public is, you know, crying out for

information every day on what's going on with these different variants and where they stand, and an expert gets up and says, you know, we developed this product or this antibody in this way and we think it's going to work for this one and here is why we think that, but we're going to test it and we're going to let you know, to say that that's fraud is not what Omnicare says.  It's not what PSLRA says.  It's not what Sarepta and Karyopharm in the First Circuit said.  It's not what Judge Kelley held just a few weeks ago following the law of this circuit which is very well developed.  So with no false opinion, no forward-looking statement, that doesn't work and no scienter, this case dies.  Thank you, your Honor.

THE COURT:  Okay, thank you.  I'm going to take the motion under advisement.  Thank you both for very well argued and prepared arguments.  We'll stand in recess.


**(A-D-J-O-U-R-N-E-D)**

- - - - - - - - - - - - -

**CERTIFICATION**

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jamie K. Halpin_____    June 7, 2024_____
Jamie K. Halpin, RPR, RMR              Date
Official Court Reporter